Good morning and welcome to the Ninth Circuit Court of Appeals. My name is Morgan Christen and I'm one of the judges on the circuit court. I am sitting this week with Judge Hurwitz, my colleague from Phoenix, and delighted to be sitting. We both thank and welcome Judge Wallach for joining us to help us out with our calendar this week. Just a bit of housekeeping. There are three cases for which we will not hear argument today. They are 23-1840, Rosas-Rosas v. Garland, 23-2068, United States of America v. Roland, and 23-2632, Alberto Zarco v. Garland. The first case on the oral argument calendar has two case numbers, 21-1422 and 23-1997, Murillo-Chavez v. Garland. Counsel, if you could give me one minute to get the iPad and stuff set up here, I'll be ready to go. Okay. I think we're ready. Good morning, Your Honors. May it please the Court. My name is Rachel Game and I'm appearing on behalf of Edgar Murillo-Chavez. I'd like to reserve two minutes for rebuttal. Sure. I'd like to raise the following issues this morning. Whether Mr. Murillo-Chavez's convictions for unlawful use of a weapon and criminal mistreatment are CMITs and whether the grant of SIJS is admitted in any status for purposes of accruing residents to be eligible for cancellation of removal under 1229 B.A. On that first one, you say in your opening brief at 10 pages, 19 through 29, that the board erred on CMIT. What's your strongest legal authority for that proposition? For the unlawful use of a weapon? On it not being a crime involving moral turpitude. The strongest argument, I believe, is that— On its legal authority. Right. Would be the Court's ruling in Flores-Vasquez v. Garland, where the Court held that the crime of menacing is not a CMIT? Even if the possession of a weapon with intent to harm is not a CIMT, you don't prevail unless the other conviction is also not a CIMT, correct? I could prevail if an SIJS is an admission and— Let's assume for a moment that the admission only occurs when your client became an LPR, okay?  If one of the two cited crimes is a CIMT, then you lose on the CIMT front. They don't both have to be. Only one has to be, correct? Correct. So I'm interested in you addressing not the weapons possession charge, but the charge of not providing necessary aid to a dependent child. It requires knowingly not doing so. That strikes me as a crime involving moral turpitude, so I'd like to hear you address that crime. Okay. Yeah, there's authority that says that not providing glasses to a child is a crime involving moral turpitude in certain circumstances. I don't have direct authority with the Ninth Circuit, Your Honor, but I would point to that the way that Oregon defines knowingly is a general intent crime. So knowingly only refers to the conduct and not to the outcome. And the outcome is, whatever the outcome of the conduct, is criminal negligence. So both of those... No, this requires more than negligence. This requires that you know that somebody required, not that you should have known, but that you know that somebody should have required this aid and nonetheless decided not to provide it. It doesn't require that you intend to harm the person, but it does require under Oregon law that you know that the dependent require the assistance and decide not to provide it. And that strikes me as... If I think of moral turpitude, what I think of is sort of blameworthiness in a more philosophical sense than just the fact that it violates the law. This one strikes me as quite close to what I would think is a crime involving moral turpitude. The gun possession thing may or may not, but this one I'm having trouble concluding that it's not. So help me. I would point to another case in Oregon, which was actually criminal mistreatment in the second degree. The only difference between first degree and second degree is first degree is knowingly and second degree is with criminal negligence. In that case, the state v. Worthington, and in that case, the family were very religious and they believed that they could heal their daughter through anointing oils and prayer and the daughter ended up passing away. But that was a negligence case. That was a criminal negligence case, was it not? That was criminal mistreatment in the second degree. In the second degree, which only required a negligent state of mind. Right. This is not in, this conviction is not in the second degree, is it? No, this was knowingly, but they're both general intent crimes. So neither one had to be intentionally causing the outcome. So in the case of Drown, which I cited in my brief, the mother, she was a battered wife and she was under the influence of her husband, who called himself the Messiah, and she didn't get any of her children medical care, but not with the intention to harm her children, but just knowing that they may have needed care. Does a crime involving moral turpitude require the intent to harm? I would say it does. Then why, if it does, then why doesn't the firearms offense fit perfectly within it? Because you can't be convicted in Oregon of the firearms offense without the possession with the intent to harm someone. With the firearms conviction, it's the intent to threaten somebody. Unlawful use of a weapon is the intent to threaten, not necessarily to cause harm. The harm is the fear. Isn't the harm the threat? The harm could be the fear, but as the State v. Rose points out, that in that case when the trooper stopped the car on suspicion of DUI, in that case, there was no evidence in the record that the trooper had fear or that he was harmed when he saw the holster without a gun, he asked the defendant, do you have a gun, and she handed it to him. And just based on that, she was convicted of unlawful use of a weapon, and there was no evidence in the record that that trooper actually experienced any harm. We took you out of the order that you started in, and I know you wanted to address what the date of admission was. And I think we asked counsel to be prepared to address the Hernandez case, which wasn't cited in the briefs. Correct. Doesn't that make it pretty clear that the date of admission was when your client became an LPR? Well, Petitioner acknowledges after this Court's decision in Hernandez v. Garland that the pathway back to Garcia v. Holder is more challenging, but the Petitioner would also argue that Hernandez v. Garland went too far by expanding the holding in Sanchez. We're bound by it. We're a three-judge court. Aren't we? Sorry. You had asked it before. Well, in Hernandez v. Garland, the Court held that Sanchez effectively overruled precedent judicially expanding the statutory definition of an admission, and also establishes that Hernandez's TPS does not constitute an admission in any status. And the Court cited U.S. v. Delgado-Ramos. We have to assume as a three-judge panel that Hernandez is right. Well, we're bound by it. We're bound by it. And an en banc court could overrule it, but didn't. So if Hernandez is right and TPS status doesn't give rise to admission, how could LPR status give rise to admission? How could, I'm sorry, SJS? If Hernandez is right, then there could be no judicial expansion of what the term admitted means, which means that Mr. Murillo-Chavez was never admitted because the definition that LPRs, when they adjust status, like he did through SJS, that that's an admission, that's also a judicially expanded definition of what it means to be admitted. Well, but I think what you're doing is criticizing the reasoning of Hernandez. And perhaps, I don't forgot who wrote it, maybe I did, maybe Judge Kristin did, but perhaps whoever wrote it made a mistake. But if it's taking Hernandez at face value, doesn't that doom your argument about when your client was admitted? Well, that is true, but if we take Hernandez at face value, then my client could never even have been removable as charged because he was never admitted as an LPR. We didn't make that argument in our brief, but that's, if you read Hernandez overruling all judicially expanded definitions of admission, then it has to also go to that he was never admitted as an LPR because that's a judicial expansion of what it means to be admitted. One other possibility, and you haven't suggested this, and I'm not trying to put words in your mouth, but since I jumped in to say that we're bound by this authority, as a three-judge panel we are, occasionally somebody appears before us procedurally, and there's nothing improper about that. And what they're really urging is that we take the case en banc and reconsider it. But I don't know if that's the pathway you're taking or if what you're telling us is that you think that this most recent authority doesn't doom this argument. I think your word was doom. Well, the other argument I do have, Judge Kristin, is that in Sanchez, that an SAJS, they did seem to carve out a little exception for SAJS because it has a special provision for adjustment of status, like a U visa, and we do know that USCIS is treating when someone gets a U visa, whether they're admitted with a U visa or they're a non-immigrant status, they're treating that as being admitted so they can adjust status under 1255A. And SAJS is similar to a U and a T visa in that there is a special provision under 1255H1 for them to adjust. So that does take it out of that it's not, they're not being admitted because of all of these equities and benefits that they have in SAJS status, but they're being admitted because they have a specific pathway to be adjusted within the U.S. and also the parole that SAJS gets isn't specifically excluded in the statute from being an admission. I'm not sure how much time you wanted to reserve, forgive me. Do you have more you want to tell us now, or would you like to reserve the remainder of your time? I'll reserve the remainder. That sounds great. We'll hear from opposing counsel. Good morning, may it please the court. My name is Craig Newell, and I'm here on behalf of the Attorney General. Mr. Mario Chavez is statutorily ineligible for cancellation of removal because the application of the stop time rule precluded him from establishing the seven years of continuous residence he needed to obtain that relief. And the two main issues are, as my colleague stated, whether he has been convicted of a crime involving moral turpitude, the commission of which triggered that stop time rule, and the second is how do we go about calculating the period of continuous residence. And I'll address them in that order if the Court wishes. So as to the crime involving moral turpitude, there are two convictions here, either one of which would bar him from this relief. Address the gun crime first. We used to be able to say the BIA has said this is a crime involving moral turpitude, but we're no longer required to defer to their reasonable interpretation after Oberbrecht. So it's sort of strange. No harm occurred in the case. No actual threat was made. Why is this a crime involving moral turpitude? It is still a crime involving moral turpitude. And even the fact that you no longer, Oberbrecht says there's no longer that deference. This Court has the power of persuasion. And this Court has been persuaded in these, this offense is similar to an aggravated assault. But if there, if it were an assault, our cases say, I'm thinking of Flores-Vazquez, an evil intent and the infliction of substantial harm. So if it were an actual assault, so, but there is no infliction of substantial harm here. There's only the intent part, but not the actus rea part, if you will. Right. But in Flores-Reyes, the reason why the Court in that menacing, which was an offense very similar to a simple assault, looked for both an evil intent and that actual harm is because there, because. Vile and depraved conduct that shocks the public conscience, the Court said last year, two years ago in Ortiz v. Brown. Well, we've said that for decades. Correct. And there's, so I have a question if I could interject. Forgive me. But, you know, I think we're all still figuring out what Loper-Bright's going to mean. But if you look at the arc of what a crime involving moral turpitude meant, my colleague has just given you the, as you know very well, the historic, and it is, there's been mission creep, pretty serious mission creep in this area. And it used to be that our case law, our case law interpreted the statute to really exclude property crimes, right? We were looking at crimes of violence against humans, the victim needed to be a person, and we were looking for physical harm, you know, to a human. And, of course, there's been this evolution, I'll say, in the case law. I don't know that we have created that. I think we're following and giving deference to the agency so that we got to a place in some instances where statutes involving petty theft were deemed crimes involving moral turpitude. So it's really been a shift. So I'm just going to invite you to engage in this. And if we look really just at the, where we started, and is it correct for us to roll the, it requires a bit of time travel, it seems, where should we be on this continuum now in light of Loper-Bright? When, and when you engage in that time travel, start with, you could hang a child for stealing a loaf of bread in England in the 18th and 19th century, you know. Perhaps not quite that far back. Perhaps not quite that far back. But you take, I don't think I articulated my point very well, but you appreciate, as Judge Hurwitz said, we're now talking about a harm, it's a human, it's not a property offense, right? But nobody got shot, the harm is the fear. Where does that fall on the spectrum? If this falls on the spectrum, I, to go back and give the historical context, I think this court, as well as the board, have always, it looked for that morally base and deprived and contrary to social norms. And it looked at two things. That's what I'm asking you to engage with. The board hasn't. The board has changed its mind over time and got to the place where they were going to include property crimes, right? Including, in some instances, petty theft, including stealing a sandwich. So if we can erase that from our memories, or should we be erasing that from our memories and going back to the sort of quintessential way we have defined this, looking just at the statute, vial and base. Right. I think, first, here we don't, neither of these offenses are the property crime situation. The property crime situation more, and I don't want to get into it that much, but they more mirrored the fraud type crimes. Because of, the CIMT has always been about, it's about judging the offense. It's what does that offense say about the person's character? Does this offense reflect poorly on the person's character? And that's why there's such an emphasis on the mens rea in these crimes. So here we have a specific intent crime, whether you are using it to actually inflict or using it to immediately threaten someone. Both of those have that malign intent that's very highly characteristic of a CIMT. That is very much present in this unlawful use of a weapon crime. Because the harm is you're intentionally causing fear in another human. And you're doing it with this aggravating factor of the deadly or dangerous weapon is what's elevating something that appears very similar to an assault or these menacing. It elevates it to a morally turpituous crime. Because you take the fact, you take that Rose case, you have a situation where this woman, Ms. Rose, had that malign intent. They get pulled over as she takes a loaded pistol out of her purse and takes the safety off and cocks it, hides it under the purse. And when the officers, you know, approaches them and asks for the license of the driver, she's about to pull it out and he stops her. For whatever reason, she doesn't go, luckily, go forward with anything. But this is covering, like, this situation of this split second where one second later, you do have a violent confrontation and a potential of serious harm. And that's what... It is a serious crime. No one doubts that. Right. The difficulty, I think, is that the possession of the weapon, at least on the elements of the offense, is not itself illegal. In other words, we're not dealing with a convicted felon possessing... Right. So we have somebody who's engaged in a legal conduct who, in this case, because we're talking about an attempt as opposed to actual offense, with evil... Has evil intent. And that just seems to be enough, in your view, to constitute a CIMT. It's not the nature of the crime, in this case, that you're arguing constitutes it. It's merely the intent, isn't it? No one was put in fear in this case.  No one needs to be put in fear, I'm sorry, under the statute because it's only an attempt. Right. And because, in the end, the CIMT inquiry is looking at... How does it reflect on the defendant's character? Why aren't property crimes then all covered? I mean, because it's a pretty... I intend to go into your house and steal your jewelry. That's a pretty... But that's not the case, though, that the court did not lead the charge on that. The court did not lead the charge in expanding CIMTs to property crimes. And as you've acknowledged, this is not a property crime. Right. And we don't have to address that here. And I think I, as in a lay sense, people get sense, oh, petty theft, that why, how can that be a CIMT? And that is a question for another day, but here we... Part of the problem is, and now that we don't have deference, no one really knows what a CIMT is. It's a mushy definition. And so what we're trying to do is find a combination of actions and mens rea that lead us to believe that the person somehow has moral turpitude. Well, that's not what I was trying to do. As an initial step, forgive me, but as an initial step, as I'm trying to figure out what Loper Bright is going to mean and what is your position about whether we should be trying to roll back our case law and looking to the, what I will say is the traditional definition that Judge Wallach has asked us to revisit and peel off this layer of evolution that I think was deference to the agency, expanding what does or does not fit within that basket. So I was asking you to address that. Okay, a more conceptual... Okay, I understand. Just in terms of the decision, the framework we ought to use here. I have two answers for that. First of all, as with respect to Loper Bright in particular, the Supreme Court did advise that just because it has overruled Chevron, it does not call into question all cases that previously have relied on Chevron. It's not an automatic that they still are awarded stare decisis. And the second more particular point is while there may have been an evolution as to the application of the CIMT to particular types of crime, the focus on base-deprived conduct and looking at the intent in the conduct, the intent in the actus reus, and looking at them in concert, this Court and the Board have both said that that's the approach. And while reasonable minds can disagree on how to do that, look at the combination, I think even to look at this, and this is a de novo situation because this is not a Board precedential decision. Here, de novo, looking at what we have with this unlawful use of a weapon, both avenues of a violation involve the specific intent to immediately harm someone or immediately threaten them with harm with a dangerous or deadly weapon that is specifically designed to cause such death and serious harm. In the Altiar case, the Court recognized that that aggravating factor, that is what steps this up from your normal assault or criminal threat situation. Your response of the Judge Christian's question, and it really goes to both crimes here, there's plenty of intent on the gun side of this case. There's an evil intent. But the act, which is just possession of the gun with the evil intent, doesn't strike me as all that morally corrupt. On the child case, on the dependent, taking care of the dependent side, the conduct strikes me as incredibly morally corrupt. But I'm worried about whether there's a sufficient intent if it just has to be knowing. So would you address that?  Yes, Your Honor. I think, and here's, this is another example of how we look at all these things in concert. Yes, the conduct is quite severe. And the Oregon courts have said that this is conduct that causes or will cause serious injury. I don't dispute that this is a general knowing intent is applicable here. But there are circumstances where that is sufficient. When the harm, the resulting harm or conduct is quite severe, which we have, and we have this other additive factor that this is not, this is involving a protected class of victims. The victim is someone who you have a legal duty over, which is most likely your child or someone who is a dependent on you. So, I mean, and so in that situation, you have a CIMT. Even though you don't have a specific intent manager, you have this very severe conduct. You have this aggravating factor of a protected class of victims. So it's all this weighing that you have to do. And they're kind of, they're both, these are kind of two different sides of a coin, where one's more intent heavy and the other one's more conduct heavy. But either way, you have a crime involving moral turpitude. Within the general context, I suppose another way of looking at it is, is this an action which is frightening to society? And how frightening is it? Right. I think that's another way. Because in the end, these are crimes that society is not just saying are legal, but are condemning them as a substantive normative judgment that these are moral wrongs, malum, I'm going to mess it up so I won't say the one. And these are, these both are. Society does not want people walking around with guns, holding this, simultaneously holding this intent to harm someone with them. And nor do we want someone who, with someone under their care, knowingly withholding such things that they need for their basic survival. I see my time is running low. And I just want to briefly address the Hernandez decision and the admission issue. The Hernandez decision and the Santos v. Mayorkas decision, they put further and final support that this grant of SIJ status is not admitted in any status. Because it does not meet the statutory definition of admittance, which is someone entering from outside the country and being inspected and authorized. And it is very similar to TPS in the fact that this special immigrant juvenile status can only be given to someone who is in the United States, because it's someone who's in the custody of a United States-based juvenile court. So it's very similar. And I wanted to just address that an adjustment of status, that's not a judicially created admitted in a status, because there is a separate definition at 8 U.S.C. 1101-820 for admitted as a permanent resident. And admitted as a permanent resident is defined as someone who's been accorded permanent resident status. So the judicial definition of someone admitted in permanent resident status includes someone who was admitted from outside the country with law and came in here as a lawful permanent resident, or someone who obtained it through adjustment of status in the United States. And so that's why that is not a separate issue. So if there are any other questions, I appreciate your questions. And thank you very much, Ruud. Thank you very much. Thank you for your argument. You have some rebuttal time remaining. My colleague, Mr. Newell, is phrasing unlawful use of a weapon as a type of an assault. And I just want to point out that ORS 166-220 is actually categorized with public order offenses. And it's not categorized under offenses against people. And I think- They have to be an offense against a person, right? By just looking at the elements? I mean, I'm willing to roll back and look at this, you know, as I indicated, I'm entertaining this thought experiment about what Loper Bright means. But the traditional CIMT did involve a threat against a human. You know, and the harm I think here is the menacing. And Judge Hurwitz has taken you through the mens rea element. So regardless of where it's housed, as a matter of formatting, doesn't the victim have to be a person to have been menaced? It does have to be a person. But I'm just saying that I think it goes too far to say it's a type of an assault conviction. But why not? The harm is the fear, right? Can you help me out with that? I'm not sure I'm getting your point. The harm is that you intend to put fear into somebody. But the person, there doesn't have to be any resulting fear or any resulting harm. Because it's an attempt. That's because it's an attempt. I think even if it were possessing- So you can have- The statute says you can have an attempt to use it unlawfully or that you can carry or possess it with the intention to use it unlawfully. If the completed crime would be a CIMT, just for purposes of discussion, wouldn't an attempt also be one? Well- Doesn't the generic definition sweep in attempts? Oregon attempt is broader than the federal definition of attempt because- Now we get into a separate set of decisions that we've made. But in general, if you have a CIMT for a completed crime, isn't the attempt to commit that crime also a CIMT? Well, there wouldn't be the resultant harm if it's just an attempt. So I don't know what you're arguing then. Are you arguing that because it's only an attempt, it's not a CIMT? I'm arguing that- If the crime had been completed, would it be a CIMT? If the person actually did feel fear- Put the person in fear of harm, would it be a CIMT? Possibly. I don't know about that. So then you're arguing- Because I'm looking at the de minimis conduct. Certainly under the elements of this, then it seems to me what you must be arguing, if it's possibly, is that it's the attempt that takes it out of the CIMT category, right? Which means that you're looking at the effect on the victim as opposed to opposing counsel's argument that we're really, for CIMT purposes, looking at the moral culpability of the defendant. Right, yeah. Is that correct? I'm not trying to put words in your mouth. I am trying to understand the distinction between your approach to this and opposing counsel's. You could have moral culpability in that you intended to do something, but it also has to be, there has to be a resultant harm. So I could have all the intent, but if nothing follows through from that attempt, then it's not a CMIT.  Is there any- So then I get- Okay, go right ahead. I guess your argument is that attempts are not CIMTs. In this statute, this isn't a CMIT. I have a little bit more time and- Actually, oh, forgive me. Go ahead. The clock has turned around and is now counting back up because you're out of time, but why don't you go ahead and wrap up? Pardon me? The clock is going back up. It went to zero and is going back up, so you're actually out of time, but go ahead and wrap up, please. Okay. I also just wanted to say about the criminal mistreatment, Judge Wallach mentioned that a CMIT has to be frightening to society, and in the Drown case, I don't think that society would be frightened that the mother delayed in getting her or didn't get her child glasses, and I don't think that that falls within frightening society. You don't? No. Society has no interest in children having proper care? To me, that seems an essence of society. Well, I think in a lot of these cases, though, it's because the motivation that the parents had was based on religious values. And I think that we, in society, give a lot of leeway. Burn the child at the stake. That might be murder. And it might be religiously motivated. Well. I'm just saying that you can take that. Thank you, Your Honors. Thank you for your advocacy. We're going to take this case under advisement and thank both counsel for their briefing and for their argument today.
judges: Wallach, CHRISTEN, HURWITZ